UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------- X
:
PSEG LONG ISLAND LLC, and the LONG :
ISLAND LIGHTING COMPANY d/b/a LIPA, :
:
                       *Plaintiffs*, :    **Case No. 15-cv-0222 (ADS/ARL)**
:
       -against- :    **Joint Rule 56.1 Statement**
:    **of Material Facts**
TOWN OF NORTH HEMPSTEAD, N.Y.; JUDI :
BOSWORTH, in her official capacity as Town :
Supervisor for the Town of North Hempstead, :
N.Y.; and THOMAS P. TIERNAN, in his official :
capacity as Superintendent of Highways for the :
Town of North Hempstead, N.Y., :
:
                       *Defendants*. :
---------------------------------- X

      Plaintiffs PSEG Long Island LLC ("PSEG Long Island") and the Long Island Lighting Company d/b/a LIPA ("LIPA"), through their counsel Greenberg Traurig, LLP, and Defendants Town of North Hempstead, Judi Bosworth, in her official capacity as Town Supervisor for the Town of North Hempstead, and Thomas P. Tiernan, in his official capacity as Superintendent of Highways for the Town of North Hempstead (collectively, "the Town"), through their counsel Elizabeth D. Botwin, the Town Attorney, submit the following joint statement of material facts as to which the parties agree there is no genuine issue to be tried, pursuant to Local Civil Rule 56.1 of the Civil Rules of the United States District Court for the Eastern District of New York.

      A.    <u>Parties</u>

      1.    Plaintiff the Long Island Lighting Company d/b/a LIPA ("LIPA") is a domestic, not-for-profit, corporation duly organized and validly existing under the laws of the State of New York. LIPA is a wholly owned subsidiary of the Long Island Power Authority ("Authority"). *See* New York Public Authorities Law ("PAL") §§ 1020-c, 1020-h. LIPA acquired the retained

assets of the Long Island Lighting Company ("LILCO") pursuant to agreements entered into in 1997. Under those agreements, LIPA became the owner of LILCO's transmission and distribution ("T&D") facilities on Long Island. *See Suffolk County v. Long Island Power Authority*, 177 Misc.2d 208, 212-216 (N.Y. Sup. Ct. Suffolk Co. 1998) (explaining the transaction that resulted in the Long Island Power Authority's acquisition of LILCO's assets). LIPA owns the electric T&D infrastructure in the Town, including utility poles located in the Town.  Affidavit of Andrew McCabe ("McCabe Aff."), sworn to on March 17, 2015, annexed to Plaintiffs' Notice of Motion for Summary Judgment, ¶ 3.

2. LIPA accrues revenues from fixed rates charged to customers within its service territory for the furnishing of electric power and related services.  *See* PAL § 1020-f(u). The process by which LIPA fixes its rates is established pursuant to statute, and the rates so fixed are subject to recommendation by the New York State Department of Public Service and approval by the Authority's Board of Trustees. *Id.*

3. When LIPA entered into agreements to acquire LILCO's assets, it acquired all franchise and utility service responsibilities for all ultimate consumers of electricity within LILCO's former service territory. *See City of New York v. LIPA*, 14 A.D.3d 642 (2d Dep't 2005) (citing PAL § 1020-g(n)). Pursuant to its enabling legislation and various franchise agreements, LIPA is the sole electric service provider within its service territory, which includes the Town. LIPA has no commercial competitors for the supply and transmission of electricity to ratepayers in its service territory, and does not commercially advertise, market, or promote the sale or transmission of electricity to its ratepayers. McCabe Aff. ¶ 4.

4. LIPA's Tariff for Electric Service provides that any attachment to a utility pole is subject to permit and written agreement, as well as a fee of $5 per pole per year. McCabe Aff. ¶

5 (citing http://www.lipower.org/pdfs/company/tariff/lipatariff.pdf, Leaf No. 106). "Consistent with the Authority's written policy, LIPA may waive the pole attachment fee for temporary or seasonal attachments that support a patriotic, civic, or ceremonial purpose, or where the tangible value of the attachment is nominal to both parties." *Id.*

5. Plaintiff PSEG Long Island, LLC ("PSEG Long Island") is a wholly-owned subsidiary of Public Service Enterprise Group, Inc., which is a public corporation whose stock is traded on the New York Stock Exchange. *See* Rule 7.1 Disclosure Statement annexed to Complaint ("Compl."). PSEG Long Island, through an Amended and Restated Operations Services Agreement ("OSA") dated as of December 31, 2013 between PSEG Long Island and LIPA, is LIPA's service provider. McCabe Aff. ¶ 8 (citing http://www.lipower.org/papers/OSA.pdf ("OSA"), at 8). In that capacity, PSEG Long Island operates the T&D System in most of Long Island, including the Town, and is responsible for installing, replacing and otherwise maintaining utility poles that are located in the Town. OSA at 8, 10-11.

6. Pursuant to the terms of the OSA, PSEG Long Island and its management are "the name and face of the T&D System electric utility service in the" Long Island service area. *Id.* at 21. For example, PSEG Long Island's marks are used with respect to "all signage, customer bills, vehicles, equipment, uniforms, letterhead, and on utility-related communications, advertisements, public announcements and websites" associated with the service area, and PSEG Long Island has "full authority to determine policies and procedures with respect to the use of" its marks. *Id.* at 21-22. Furthermore, PSEG Long Island is directly responsible "for media and other public communications on all utility-related matters, including communications with public officials and local municipalities and counties regarding storm preparation, management,

coordination and response, customer communications, programs and complaints and related matters," and has "full authority to determine all communications policies and procedures relating to its provision of" services under the OSA. *Id.* at 22.

7. Defendant Town of North Hempstead ("the Town") is a municipal corporation and political subdivision of the State of New York. Defendant Judi Bosworth took office as the Town Supervisor on January 1, 2014. The Supervisor sits on the Town Board. The Supervisor proposed that the Town Board enact the local law adding Chapter 64B to the Town of North Hempstead Administrative Code ("Town Code"). Affidavit of Supervisor of the Town of North Hempstead, Judi Bosworth ("Bosworth Aff.") sworn to on March 19, 2015, annexed to Defendants' Notice of Motion for Summary Judgment, ¶¶ 1, 16. The Supervisor is responsible for the enforcement of Chapter 64B in the Town in her official capacity. Defendant Thomas P. Tiernan is the Town Superintendent of Highways, charged with conducting investigations and with enforcement of Chapter 64B in his official capacity. Chapter 64B annexed to the Complaint as Exhibit 1.

B. <u>The Project</u>

8. On September 23, 2013, LIPA mailed a letter to the prior Town Supervisor, Town Council Members, County Legislators and Mayors of the Villages located within the Town regarding its intent to proceed with the *Port Washington to Great Neck Overhead Transmission Project* ("Project"), to consist of the installation of, among other things, a new 5 mile-overhead, 69 kilovolt ("kV") transmission line over an existing route that already carried a 13 kV distribution line. Affidavit of Matthew Gianelli ("Gianelli Aff."), sworn to on March 17, 2015, annexed to Plaintiffs' Notice of Motion for Summary Judgment, ¶ 4. The overhead portion of the Project entailed replacement of 213 existing utility poles having a height of between 40-45

4

feet with utility poles having a height of between 80-85 feet. *Id.* ¶ 7. The Project served a dual purpose: (i) to address the increased energy needs of an area that is prone to blackouts; and (ii) to make the distribution system more storm resilient through the installation of utility poles capable of withstanding hurricane-force winds of up to 130 miles per hour. *Id.* ¶ 6.

9. The Superintendent of Highways issued permits, dated November 18, 2013, to LIPA and National Grid to replace twenty-three utility poles located within Town road rights-of-way. *See* Town Permits, approved on November 18, 2013, copies of which are annexed as Exhibit ("Ex.") A to the Answer ("Ans."). The remainder of the 213 poles ultimately replaced as part of the Project are located along New York State Route 101 (Port Washington Boulevard) and New York State Route 25A (Northern Boulevard). Gianelli Aff. ¶ 9. Port Washington Boulevard and Northern Boulevard are State roads. Under New York State Highway Law § 140, the Town is responsible only to maintain sidewalks along State roads. The 23 utility poles that Highway Superintendent Tiernan issued permits for as part of the Project were located on Town roads or rights-of-way. As related to the Project, Chapter 64B applies only to the 23 utility poles. Affidavit of Superintendent of Highways Thomas P. Tiernan ("Tiernan Aff.) sworn to on March 19, 2015, annexed to Defendants' Notice of Motion for Summary Judgment, ¶¶ 1, 5, 6.

10. The Project was commenced on or about January 1, 2014 and was completed in June 2014. Gianelli Aff. ¶ 8.

11. Both the poles replaced as part of the Project, as well as the replacement poles, were treated with the pesticide Pentachlorophenol ("Penta"). LIPA and PSEG Long Island also use utility poles that are treated with a pesticide having as an active ingredient chromated copper arsenate ("CCA"). *Id.* ¶ 7.

5

12. Both Penta and CCA are listed as "restricted use" pesticides by the United States Environmental Protection Agency ("EPA"), pursuant to its authority under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"). *See* EPA, "Reregistration Eligibility Decision of Pentachlorophenol," EPA 739-R-08-008 (September 25, 2008), http://www.epa.gov/pesticides/reregistration/REDs/pentachlorophenol_red.pdf, at 5; EPA, "Reregistration Eligibility Decision for Chromated Arsenicals," EPA 739-R-08-006 (Sept. 2008), http://www.epa.gov/oppsrrd1/reregistration/REDs/cca_red.pdf, at 12. Both documents are attached as Exhibits B and C, respectively, to the Affidavit of John Samuelian, Ph.D. ("Samuelian Aff."), sworn to on March 18, 2015, annexed to Plaintiffs' Notice of Motion for Summary Judgment.

13. A similar project in East Hampton is the subject of a complaint filed in *Forst v. LIPA*, Index No. 010675/2014 (Sup. Ct, Suffolk Co.) (Tarantino, J.), which includes claims about the alleged danger to plaintiffs from Penta-treated utility poles located within municipal rights-of-way. The defendants in *Forst* (who are the Plaintiffs here) have moved to dismiss the complaint, which motion is fully submitted and pending. McCabe Aff. ¶¶ 10-11.

14. On or about March 24, 2014, Town Supervisor Bosworth in her official capacity gave a speech about the Project at a meeting held at the Harbor Links Golf Course Clubhouse, in Port Washington, and open to the public. As part of the speech, Supervisor Bosworth stated the following:

> And then there are the poles. Taller. Unsightly. And certainly not in keeping with our vision for Port Washington and Manhasset.
>
> Most People with whom I have spoken agree that, ideally, the poles should go and wires should be buried.
>
> I believe tonight should be the beginning of a public conversation with PSEG about the feasibility of moving at least some of the wires underground, whether

> that ultimately would be on Port Washington Boulevard, on other affected streets, or at some future time on Main Street.

A copy of the March 24, 2014 speech is annexed as Ex. B to the Ans.

15. The Town sent a letter to Town residents, dated March 24, 2014, concerning the Project. A copy of the March 24 Letter is annexed as Exhibit ("Ex.") 2 to the Compl.

16. At its April 1, 2014 meeting, the Town Board approved hiring a consultant to review the cost of putting the wires underground. Bosworth Aff. ¶ 9, A copy of the resolution is annexed as Exhibit D to the Bosworth Affidavit,

17. On or about April 24, 2014, Supervisor Bosworth learned about a report prepared by Peter Dermody, a hydrogeologist, which determined that soils immediately adjacent to three recently installed utility poles in East Hampton contained Penta. Bosworth Aff. ¶ 6. A copy of the report is annexed as Exhibit B to the Bosworth Affidavit. Mr. Dermody attached the same report to an affidavit that he signed and that the plaintiffs submitted as part of their papers in opposition to defendants' motion to dismiss filed in *Forst, supra*. McCabe Aff. ¶ 12.

18. On April 24, 2014, Supervisor Bosworth wrote to various State officials asking the New York State Department of Environmental Conservation ("DEC") to investigate whether soils near the utility poles installed as part of the Project also contained Penta, and attached the Dermody report as a reference. Bosworth Aff. ¶ 7. A copy of the letter is annexed as Exhibit C to the Bosworth Affidavit. To date, DEC has not ordered any action with respect to the utility poles installed as part of the Project. McCabe Aff. ¶ 12.

19. Additionally, in a letter to the Suffolk County Department of Health, dated June 6, 2014, the New York State Department of Health responded to questions regarding the Dermody report by stating the following:

7

> [P]eople would be unlikely to contact soil near the poles with sufficient duration and frequency to result in a significant risk for adverse health effects. To further evaluate exposure to this soil, we examined the potential for acute (short-term) health effects in a child who might sit at the base of a pole and eat some of the soil. Even at the highest pentachlorophenol soil concentration reported in the April 22, 2014 Dermody Consulting letter (250 milligrams per kilogram of soil), the exposures that might result from this kind of activity are well below exposure levels that might cause health effects.
>
> Regarding the health risks to people who might, for example, put their hands on the utility poles, there is ample scientific information to indicate that direct contact with pentachlorophenol can irritate the skin and eyes. Therefore, it is possible that people who have direct skin contact with a utility poles treated with pentachlorophenol-containing product could experience skin irritation. However, we would not expect frequent, routine or long duration skin contact with utility poles.

*Id.* ¶ 13 and Exhibit C thereto.

20. On April 30, Town resident Brian Goldberg emailed the Supervisor a link to an East Hampton Star article about residents' concerns over Penta and the new poles in East Hampton. A copy of the email is annexed to the Bosworth Affidavit as Exhibit A.

21. On dates including May 1, May 6 and May 7, 2014, Chuck Idol, a Town resident, emailed the Supervisor and Councilwoman De Giorgio information and links to reports concerning the Penta. Copies of the emails are annexed to the Bosworth Affidavit as Exhibit B.

22. On May 9, 2014, Doug Wood, the Executive Director of the group "Grassroots Environmental Education" among other things, sent an email to the Supervisor, stating the following:

> I am attaching a sample sign for the pentachlorophenol poles being installed by PSEG. Although we acknowledge that PSEG is under no legal obligation to place these signs on their poles, we believe that people living near these poles, and especially the parents of children who may encounter the poles as they walk on sidewalks, have the **right to know** that the poles contain a highly toxic pesticide known to cause health problems and classified by the EPA as a Class 2B (probable) carcinogen.

Mr. Wood annexed a proposed sign to his email as follows:

8

> DANGER
> Health Hazard - Do Not Touch!
> This utility pole has been treated with pentachlorophenol
> (PCP), classified by the Environmental Protection Agency
> as a Group 2B probable carcinogen. PCP is toxic to
> humans and animals through ingestion, inhalation and
> skin absorption. In case of accidental exposure, wash
> immediately with soap and water.
> If irritation persists, seek medical attention.

23. On May 9, 2014, the Town Supervisor's Chief of State notified PSEG Long Island by email of the following:

> I am attaching a sample sign for the pentachlorophenol poles being installed by PSEG. Although we acknowledge that PSEG is under no legal obligation to place these signs on their poles, we believe that people living near these poles, and especially the parents of children who may encounter the poles as they walk on sidewalks, have the **right to know** that the poles contain a highly toxic pesticide known to cause health problems and classified by the EPA as a Class 2B (probable) carcinogen. There is a Town Board meeting next Tuesday night where I am certain residents will be asking about the poles. If the Supervisor can assure them that PSEG is putting warnings of this type on the poles, it will go a long way in reassuring them.

The "sample sign" attached to the Chief of Staff's email to PSEG-Long Island was identical to the sample sign provided by Mr. Wood in his email to the Town Supervisor of the same date. A copy of the Town's May 9, 2014 correspondence and attachment are annexed as Ex. 3 to the Compl.

24. On May 12, 2014, PSEG Long Island informed the Town that it did not wish to voluntarily post the "Danger" sign identified in the email from May 9, 2014. Compl. ¶ 38; Ans ¶ 38.

25. On May 15, the President of the Council of Greater Manhasset Civic Associations emailed the Supervisor a link to the East Hampton Star article and reporting that the issue of the

9

"toxicity" of the poles was a concern at the Council meeting the previous night.  A copy of the email is annexed to the Bosworth Affidavit as Exhibit A.

26. PSEG-Long Island's website contains information about Penta.  In the section "Safety & Reliability Resources" there is a link to "Study: Penta Treated Wooden Utility Poles".  The linked web page is entitled "Mike H. Freeman: Independent Wood Scientist".  Mr. Freeman's page links to multiple documents on "Pentachlorophenal Pole Information," as well as multiple documents under the heading "Chromated Copper Arsenate (CCA) Pole Information."  The "Penta Poles FAQ" links to a document that explains, among other things, that "[o]f the more than 166 million wood utility poles in service in the United States, approximately 55 percent are penta treated," and that such poles are pressure-treated in "a carrier oil consisting approximately 5.5% penta."  The document also included the following question and answer:

> "**What should I do if I come into contact with a Penta treated wood pole**
>
> Common sense care should be taken to limit prolonged skin contact with Penta treated poles or the soil at the base of the pole, just as care should be taken to limit exposure to other products containing pesticides like household garden and insect sprays. Avoid prolonged direct contact with Penta treated wood poles and wash hands or other exposed areas thoroughly. (Current US EPA Consumer Information Sheet).

Affidavit of Erin Reilley ("Reilly Aff.") sworn to on March 18, 2015, annexed to Defendants' Notice of Motion for Summary Judgment, ¶ ¶ 13 – 16 and Exhibit B to the Reilly Affidavit.

27. On May 16, 2014, the Town issued a press release entitled, "Supervisor Bosworth Calls on PSEG to Alert Residents of Potential Health Risks of 'Penta.'" A copy of the Town's May 16, 2014 press release is annexed as Ex. 4 to the Compl.

28. In correspondence to the Town, dated June 10, 2014, PSEG Long Island provided a further, written notice to confirm that the company would "not post warning signs on the newly

installed poles that are composed of and treated with the same material that have been installed across our service territory on Long Island and in the Rockaways and throughout the United Sates for many years." The letter also provided a link to the website of Mike H. Freeman, a copy of Mr. Freeman's "Frequently Asked Questions" regarding Penta, and noted that PSEG-Long Island provided the same information to the Town on April 30, 2014. A copy of PSEG Long Island's June 10, 2014 correspondence is annexed as Ex. 5 to the Compl.

29. On June 24, 2014 the Town Board unanimously resolved to hold a public hearing on July 15, 2014 on a proposed local law establishing Chapter 64A of the Town Code: "Removal of Double Utility Poles". Resolution 444-2014. Bosworth Aff. ¶ 11.

30. The draft local law was publicly circulated on July 3, 2014. The stated purpose of the proposed local law was to "require the removal of double utility poles from Town road right-of-ways." A copy of the July 3, 2014 Proposed Local Law is annexed as Ex. C to the Ans.

31. The Town Board opened the public hearing on the proposed Chapter 64A on July 15, 2014. Supervisor Bosworth introduced the legislation by stating:

> This is legislation that we are proposing. It's in direct reaction to the 80 foot poles that were recently put up by PSEG. We had the assurance that the double wood, in fact, would be removed. We're concerned because there are so many double poles throughout the Town of North Hempstead. We want to make sure that because of aesthetics of all the double poles that are through the town and now in addition to 80 foot poles, now double poles attached to them, we are showing our utilities that we are here to stand up for our residents. We want to make sure that we do whatever we can to make sure that these poles are, in fact, removed in a timely way.

A copy of the relevant portions of the transcript of the July 15 Town Board meeting is annexed to the Bosworth Affidavit as Exhibit G.

32. After summarizing the proposed provisions of Chapter 64A, Supervisor Bosworth added the following:

11

> You know one thing that does occur to me is that there has been a lot of discussion about these poles and there also has been discussion about the penta in the pole.. . . If we could, in fact, add a provision to this legislation about putting up a notice that would alert people to the penta in the poles, certainly to let people know that if they come in contact with the poles that they need to wash their hands. That's for certain. I don't know how long the poles remain in danger in terms of contact. There is a certain point that the penta bleeds into the soil, but at a certain point I think that's no longer an issue. Perhaps if we could look into the length of the time that occurs and then perhaps add this to this legislation.

Councilwoman De Giorgio and Councilman Zuckerman stated that they thought the suggested amendment was a good idea. *Id.*

33. The Supervisor received emails concerning Penta in June and July 2014. On June 5 and following up on June 16, and July 1, Brian Goldberg, a Town resident, emailed the Town Supervisor asking what was being done to warn residents about Penta-treated utility poles. On July 7, Alicia Klat, another Town resident, asked about the status of the Penta warnings and stated that she allegedly saw Penta "dripping" on garage sale signs tacked on utility poles. During July, Rebecca Singer, Co-Chair of Long Island Businesses for Responsible Energy and a co-plaintiff in the *Forst* case, sent the Supervisor emails attaching studies concerning Penta and advocating the posting of Penta warning signs on utility poles (July 8 9:20, 9:35, 11:54, July 9, July 14, and July 15). Copies of the emails are annexed to the Bosworth Affidavit as Exhibit A.

34. The next version of the proposed Chapter 64A was publicly circulated on August 1, 2014. It included a provision requiring a sign to be placed on each utility pole containing Penta, specifying that the pole "CONTAINS PENTACHLOROPHENOL" and advising that people "AVOID PROLONGED DIRECT CONTACT WITH THIS POLE" and to "WASH HANDS OR OTHER EXPOSED AREAS THOROUGHLY IF CONTACT IS MADE." A copy of the August 1, 2014 draft of Chapter 64A is annexed as Ex. D to the Ans. The final version of Chapter 64A did not include any provision related to posting a sign on utility poles. Bosworth

12

Aff. ¶17. A copy of the relevant portions of the transcript of the Town Board Hearing on Chapter 64A is annexed to the Bosworth Affidavit as Exhibit J. A copy of Chapter 64A is annexed as Exhibit K.

35. The Town Board held a public hearing on the proposed revised version of Chapter 64A on August 12, 2014. The Board accepted written submissions from PSEG-LI, Cablevision, Verizon, the Treated Wood Council, and the Town's Ecological Commission. Bosworth Aff. ¶ 15. Copies of the Ecological Commission memo dated July 29, 2014 and the Treated Wood Council letter dated August 12 are annexed to the Bosworth Affidavit as Exhibit I.

36. PSEG-Long Island's letter written in opposition to the Penta notification requirement included in proposed Chapter 64A argued, among other things, that the law violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because it "singles out utility poles treated with penta while completely ignoring utility poles treated with creosote or inorganic arsenic." Compl., Exhibit 6 at 4.

37. The Co-President of the group Residents for a More Beautiful Port Washington testified in support of the Penta warning as did Town resident Christine Hogan. Supervisor Bosworth stated that the Board wanted to get input from the utility companies and the public. A copy of the relevant portions of the transcript of the Town Board meeting on August 12 is annexed to the Bosworth Affidavit as Exhibit H.

38. At the August 12, 2014 Town Board meeting, Supervisor Bosworth suggested that, rather than including a Penta warning notice requirement in Chapter 64A – the proposed local law pertaining to double poling, the Board should consider adopting a separate local law pertaining to the posting of Penta warning signs on utility poles. She said:

> The idea of the penta signs is really in response to the fact that there was no effort made to let our residents know about the inherent dangers of penta. Now, we

13

  know that it's approved, it's got all the approvals from all the Authorities, but it doesn't take away the fact that if a child comes in contact or if an adult comes in contact with the pole, nothing horrible is going to happen to them, but they need to wash their hands. . . . . [W]e need to know that our residents are aware of the fact that should they come in contact with these poles, they – if they're children, their children need to go inside and wash their hands.

*Id.* at 6-7.

  39. Concerning Penta, Supervisor Bosworth related the arguments made by PSEG-Long Island, Verizon and the Treated Wood Council that warning signs would "create undue confusion." She stated that she disagreed with that. She also stated that "another thing that was requested was that singling out the particular chemical pentachlorophenol is unfair and arbitrary, it is one of many chemicals that are used for the same purpose, so we will review to consider eliminating any reference just to penta and changing the language to warning pesticide or chemical or a more general term…." *Id.* p. 7. The Town Board voted unanimously to set a date for a hearing to consider a law on warning signs on September 9, 2014. *Id.*

  40. Chuck Idol emailed the Supervisor on August 29, 2014, enclosing texts and fact sheets on Pentachlorphenol and pictures of recently installed utility poles. A copy of the email is annexed to the Bosworth Affidavit as Exhibit B.

  41. On August 29, 2014, the Town Attorney publicly released a draft local law – Chapter 64B – focused on the posting of signs on utility poles that contain a wood preservative deemed a "Hazardous Chemical." A copy of the proposed local law is annexed to the Answer as Exhibit E.

  42. PSEG Long Island objected to the draft of Chapter 64B in a letter to the Town, dated September 5, 2014. Compl., Exhibit 6.

  43. By letter dated September 8, 2014, the Treated Wood Council also objected to the proposed Chapter 64B, noting "that it is also incumbent on the Council to mandate 'warning

14

signs' on other sources of exposure to hazardous chemicals that might provide health risks to North Hempstead citizens," including "Township-Used Fertilizers and weed killers, [which] commonly contain hazardous chemicals or pesticides." A copy of the submission from the Treated Wood Council is annexed to the Bosworth Affidavit as Exhibit M.

      C.      Enactment of Chapter 64B: "Utility Pole Hazardous Chemical Warning"

44. On September 9, 2014, the Town Board held a public hearing on the proposed local law to consider establishing Chapter 64B of the Town Code ("Chapter 64B"), titled "Utility Pole Hazardous Chemical Warning." Town resident Chuck Idol spoke and provided printouts of the EPA reports on Penta. Mr. Idol also handed up as exhibits texts about Penta and pesticides used to treat utility poles. Bosworth Aff. ¶¶ 18–20. A copy of the relevant portions of the transcript of the Town Board Meeting on Sept. 9, 2014 is annexed to the Bosworth Affidavit as Exhibit L. A copy of the submissions at the hearing is annexed to the Bosworth Affidavit as Exhibit M. At the close of the public hearing the Town Board unanimously enacted Chapter 64B into law.

45. Chapter 64B requires each "Public Utility" to post a 4.5-inch-by-7-inch notice on wooden utility poles as follows:

> "NOTICE – THIS POLE CONTAINS A HAZARDOUS CHEMICAL. AVOID PROLONGED DIRECT CONTACT WITH THIS POLE. WASH HANDS OR OTHER EXPOSED AREAS THOROUGHLY IF CONTACT IS MADE."

Ch. 64B-3(A), (B). A copy of Chapter 64B is annexed as Ex. 1 to the Compl.

46. Chapter 64B defines "Hazardous Chemical" to mean, "[a]ny chemical compound used as a wood preservative to treat wood utility poles to protect them from fungal decay and wood-destroying pests." *Id.* at § 2. Chapter 64B defines "Public Utility" to mean, "any corporation, authority, or other entity that provides electric, telephone, cable television, or other

service including telecommunication service to the residents of the Town of North Hempstead." *Id.*

47. The notice required under Chapter 64B must be posted in a conspicuous position "at least four feet and no more than five feet from the base of the pole" on every fourth pole in a line of poles, and include text with a font size of no less than 36 point in black print on a white background. *Id*. at § 3(B). Penalties for failing to comply with the Ordinance amount to up to $500 and up to $1,000 for second offenses. *Id.* § 4(A).

48. In adopting Chapter 64B, the Town Board determined that "wood utility poles that are treated with hazardous chemicals such as pentachlorophenol, creosote, inorganic arsenic, or other similar chemicals constitute a potential danger to the public and that the public should be informed of such potential danger." *Id*. § 1(c). The Town Board also deemed Chapter 64B to "be an exercise of the police power . . . for the preservation and protection of public health, safety, and general welfare . . . ."

49. On September 9, 2014, Supervisor Bosworth and Town Board members spoke at the Town Board meeting at which Chapter 64B was enacted, and an official transcript was created. Bosworth Aff., Exhibit L.

50. The official transcript reflects the following comments by Town Supervisor Bosworth:

> There's a strong sense on the part of this Board, certainly those of us who have been involved with the 80 foot poles, that people need to know that the poles have this hazardous chemical in them, we understand that EPA has approved it and that they're all over the country, but nevertheless, if you go on to either the PSEG site or the EPA site, it will say if you come into contact with the poles, you need to wash your hands, and so this is an effort to raise consciousness to make sure that people are aware of this, and so, you know, that's one of the – certainly one of the things that has motivated this legislation. Also the public utility advisory committee which we just established under Chapter 64A is authorized to adopt rules and establish procedures relating to the hazardous chemical warnings. One

16

> of the new things that we've added to this is that there was concern expressed that it would become another kind of blight if there were signs on every pole, so what we've added to this is that for any given line or road, utility poles, the public utility shall post a warning sign on every fourth pole. We actually did a mock-up of what the notice would look like and this would be the size and this would be what it would look like. One of the questions that was raised was, you know, is this now going to go on to every fourth pole throughout the Town and that is not what the intention is. This law will apply to any utility pole that has been treated with a hazardous chemical, which is pretty much all of them, and installed after January 1, 2014, so it is really as of the poles that originally – that have gone up as a result of the PSEG project, but now it will be – these signs will go up on poles that have been put up after January 1.

Bosworth Affidavit, Exhibit L. Transcript of Town Board Meeting ("Tr."), September 9, 2015, at 65.

51. The official transcript also reflects the following comments by Town Councilwoman De Giorgio:

> I think it's important – I think it raises awareness about what kind of chemical these poles are treated with, I don't think the public necessarily realized or the, you know, I think in Port Washington it's been publicized very widely, but in other areas I'm not so sure, and I think that the point . . . made about that the EPA is now re-registering hazardous chemicals, penta in particular, perhaps it's an opportunity for the public to write to the EPA or other municipalities or elected officials to ask them to reconsider where they put these penta treated poles, so I think the legislation is a step in the right direction in terms of raising awareness. That combined with the double wood poles makes the utilities understand that we're serious about – we want to have input on this and we're serious about our quality of life here in the Town of North Hempstead and it's important to us and it should be important to them.

*Id.* at 66.

52. In response to the points made by Councilwoman De Giorgio, Supervisor Bosworth stated: "Exactly." *Id.*

53. Subsequently, State legislators introduced a bill in the Senate and Assembly to ban penta and require a warning sign similar to the Town's on poles treated with penta. A2013-

17

2015; S1879-2015. Bosworth Aff. ¶ 22. A copy of the proposed bill is annexed to the Bosworth Affidavit as Exhibit N.

      D.      <u>The United States Environmental Protection Agency Has Approved Penta and CCA for Treatment of Utility Poles and Other Non-Residential Wood Products</u>

54. Pentachlorophenol was first registered for use as a pesticide on December 1, 1950. Samuelian Aff., Exhibit B at 3. In 2008, EPA reregistered Penta for use and application as a pesticide on utility poles, pursuant to its authority under FIFRA. *Id.* at 47. The EPA does not approve Penta for general use. *Id.*

55. Since the 1940s, wood has been pressure treated with chromated arsenicals, such as CCA, to protect the wood from rotting due to insect and microbial agent attack and wood-boring marine invertebrates. Samuelian Aff., Exhibit C at 11. In 2008, EPA also reregistered CCA for use and application as a wood preservative pursuant to its authority under FIFRA. *Id.* at 42.

56. The National Pesticide Information Center, a cooperative agreement between Oregon State University and the EPA, npic.orst.edu/index, provides information on specific wood preservative chemicals. It states: "Pentachlorophenol is a restricted use pesticide and is used industrially as a wood preservative for utility poles, railroad ties, and wharf pilings." Npic.orst.edu/ingred/ptype/treatwood/penta.html; "Pressure-treated wood containing CCA is no longer used in most residential settings." npic.orst.edu/ingred/ptype/treatwood/cca.html; "Creosote-treated wood may only be used in commercial applications; there are no residential uses for creosote-treated wood." npic.orst.edu/ingred/ptype/treatwood/creosote.htm. Reilly Affidavit ¶¶ 6 – 11 and Exhibit A to Reilly Affidavit.

E.   Other Wooden Infrastructure Located in the Town that Have Been Treated with Pesticides

57. The Town owns and operates several parks adjacent to the Long Island Sound, including the North Hempstead Beach Park, the North Hempstead Dock Park, and the Manorhaven Beach Park & Pool. Each of these parks is open to the public, and includes wooden docks, fencing, moorings to secure boats, and pilings to support the docks. These wooden structures contain one or more chemical compounds used as wood preservatives to protect against fungal decay and wood destroying pests. Some of the structures are treated with CCA. Affidavit of Peter W. Zimmermann, sworn to on March 18, 2015, attached to Plaintiffs' Notice of Motion for Summary Judgment, ¶ 15.

58. There are also private marinas located in the Town that own and maintain wooden docks, moorings to secure boats, pilings to support docks and similar infrastructure that contain one or more chemical compounds used as wood preservatives to protect against fungal decay and wood destroying pests. *Id.*

59. Chapter 42 of the Town Code requires all persons to obtain a permit "to construct, maintain, erect, enlarge, install, alter or improve" any structure to be situated in or adjacent to waterways within the Town's jurisdiction but does not require any warning signs to be posted on such structures when treated with chemical compounds used as wood preservatives to protect against fungal decay and wood destroying pests, including Penta and CCA. *See* Town Code Ch. 42.

Respectfully submitted by,

| | |
|---|---|
| By: /s/Steven C. Russo<br>Steven C. Russo (SR7689)<br>Greenberg Traurig, LLP<br>*Attorneys for Plaintiffs*<br>MetLife Building<br>200 Park Avenue<br>New York, New York 10166<br>Tel: (212) 801-9200<br>Email: russos@gtlaw.com | By: /s/Elizabeth D. Botwin<br>Elizabeth D. Botwin<br>Town of North Hempstead Attorney<br>*Attorney for Defendants*<br>220 Plandome Road<br>Manhasset, New York 11030<br>Tel: (516) 869-7620<br>Email: botwine@northhempsteadny.gov |

*ALB 1847243v1*