UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
PSEG LONG ISLAND LLC, and the LONG
ISLAND LIGHTING COMPANY d/b/a LIPA,

                     Plaintiffs,

    -against-

TOWN OF NORTH HEMPSTEAD, N.Y.;
JUDI BOSWORTH, in her official capacity
as Town Supervisor for the Town of North
Hempstead, N.Y.; and THOMAS P.
TIERNAN, in his official capacity as the
Superintendent of Highways for the Town of
North Hempstead, N.Y.,

                     Defendants.
-----------------------------------------------------------------x

**MEMORANDUM OF
DECISION AND ORDER
15-cv-0222(ADS)(AYS)**

<u>**APPEARANCES:**</u>

**Greenberg Traurig LLP**
*Attorneys for the Plaintiffs*
200 Park Avenue
New York, NY 10166
      By:   Steven C. Russo, Esq.
              William A. Hurst, Esq., Of Counsel

**Office of the Town Attorney for the Town of North Hempstead**
*Attorneys for the Defendants*
220 Plandome Road
Manhasset, NY 11030
      By:   Elizabeth D. Botwin, Esq., Town Attorney

**SPATT, District Judge:**

    This case involves a constitutional challenge to a local law which requires

public utility providers to post warning signs on wooden utility poles that have been

treated with certain chemical preservatives.

On January 15, 2015, the Plaintiffs PSEG Long Island LLC ("PSEG") and the Long Island Lighting Company d/b/a LIPA ("LIPA", together with PSEG, the "Plaintiffs") commenced this action against the Defendants Town of North Hempstead (the "Town"); Town Supervisor Judi Bosworth ("Bosworth" or the "Supervisor"); and Superintendent of Highways Thomas P. Tiernan ("Tiernan", together with the Town and Bosworth, the "Defendants"). The Plaintiffs principally seek a judicial declaration that Chapter 64B of the North Hempstead Town Code (the "Ordinance" or "Chapter 64B") is unconstitutional to the extent it compels noncommercial speech in violation of the First Amendment.

Presently before the Court are the parties' competing motions for summary judgment, pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56.

## I.    Background

The facts of this case are relatively straightforward and substantially undisputed. Unless otherwise noted, the Court has drawn the following background information from the parties' Joint Rule 56.1 Statement of Material Facts (the "Joint 56.1 Statement", abbreviated as "Jnt. 56.1 Stmt.").

## A.    The Parties

### 1.    The Plaintiff Long Island Lighting Company d/b/a LIPA

The Long Island Lighting Company is a domestic, not-for-profit corporation, and is a wholly owned subsidiary of the Long Island Power Authority (the "Authority").

In 1997, LIPA entered into agreements to acquire all of the assets of the former Long Island Lighting Company, known as "LILCO," including its electric transmission and distribution infrastructure and facilities on Long Island. This acquisition also included most of the utility poles located within the Town of North Hempstead.

In addition, LIPA acquired all of LILCO's franchise and utility service responsibilities for consumers of electricity within LILCO's former service territory. As such – and pursuant to its enabling legislation and various franchise agreements – LIPA is the sole electric service provider within its service territory, which includes the Town. In this regard, for a fixed rate, LIPA provides electric power and related services to customers within its service territory. This rate is established by New York State statute, and is subject to recommendations by the New York State Department of Public Service and approval by the Authority's Board of Trustees.

LIPA has no commercial competitors for the supply and transmission of electricity within its service territory, and it does not commercially advertise, market, or promote the sale or transmission of electricity to its ratepayers.

**2.      The Plaintiff PSEG Long Island LLC**

PSEG is LIPA's service provider, meaning that PSEG operates the electric transmission and distribution system in most of Long Island and is responsible for installing, replacing, and otherwise maintaining utility poles located within the Town.

Pursuant to a contract between them, PSEG is "the name and face" of LIPA's operations on Long Island.  In this regard, PSEG's marks are used with respect to "all signage, customer bills, vehicles, equipment, uniforms, letterhead, and on utility-related communications, advertisements, public announcements and websites" associated with LIPA's service territory.  PSEG retains "full authority to determine policies and procedures with respect to the use of" its marks and is directly responsible "for media and other public communications on all utility-related matters, including communications with public officials and local municipalities and counties regarding storm preparation, management, coordination and response, customer communications, programs and complaints and related matters."  Further, PSEG retains "full authority to determine all communications policies and procedures relating to its provision of" services to LIPA ratepayers.

### 3.    The Municipal Defendants

North Hempstead is a municipal corporation and political subdivision of the State of New York.

On January 1, 2014, Bosworth took office as the Town Supervisor and, in that capacity, became a member of the Town Board.  Tiernan is the Town Superintendent for Highways.

Both Bosworth and Tiernan are responsible for enforcing the Town Code, including the provision at issue in this case.

**B.     The Project**

On or about November 18, 2013, Tiernan issued Town permits to LIPA to begin work on a project known as the Port Washington to Great Neck Overhead Transmission Project (the "Project"). Relevant here, the Project involved replacing 23 utility poles located within the Town. In particular, wooden poles having a height of 40-45 feet were replaced with similar poles having a height of 80-85 feet, in order to accommodate a higher-power transmission line. In this regard, the Project served two purposes: (i) addressing the increased energy needs of an area on Long Island that is prone to electrical blackouts; and (ii) strengthening LIPA's transmission and distribution infrastructure system – the new utility poles could withstand hurricane-force winds of up to 130 miles per hour, which, apparently, the outgoing poles could not.

The Court notes that the Project included replacing a total of 213 utility poles. However, for purposes of this motion, only the 23 poles located in Town rights-of-way are relevant.

Of importance, it is undisputed that both sets of utility poles – namely, the shorter outgoing poles and the taller incoming poles – were pre-treated with a wood-preserving chemical known as Pentachlorophenol ("Penta"). Also, the parties stipulate that certain utility poles utilized by the Plaintiffs are pre-treated with pesticides containing another wood preservative known as chromated copper arsenate ("CCA"), although it is unclear whether the 23 utility poles at issue in this case contain that substance.

The Project began on January 1, 2014 and was completed in June 2014.

## C.   The Relevant Public Discourse Concerning the Project

It is undisputed that, while the Project was underway, Supervisor Bosworth and some of her constituents openly objected to the appearance of the new, substantially taller utility poles being installed. In this regard, on March 24, 2014, Bosworth remarked at a public meeting that the new poles were "unsightly" and "certainly not in keeping with [the Town's] vision for Port Washington and Manhasset." Further, Bosworth stated that she had spoken with other people in the community who "agree[d] that, ideally, the poles should go and [the] wires should be buried" underground.

On that same date, a letter was sent to residents on the Supervisor's official letterhead, which reiterated this sentiment. For example, in the letter, Bosworth stated that one of her "main concerns" about the Project involved the failure to "explor[e] alternatives to the 80-foot poles." She also indicated that information about the Project was being circulated to residents for the purpose of "find[ing] a resolution that maintains the esthetic beauty of [the] Town, while also providing the power [it] need[s]." Bosworth also noted that "[t]he most disturbing aspect of the project for many residents are the unsightly, 80-foot high utility poles." She advised the residents that the Town Board had retained an independent consultant "to advise the Town on the feasibility of burying the wires." She also noted that PSEG had made a commitment to replace any trees that were damaged or removed in

connection with the Project, thereby achieving a " 'net gain' of trees" on affected Town streets and "creat[ing]  an attractive canopy under the wires."

Approximately one month later, one of Supervisor Bosworth's constituents provided her with a report by a hydrogeologist named Peter Dermody (the "Dermody Report").  The report describes the testing that Dermody's consulting company had recently performed on Penta-treated utility poles in the Town of East Hampton, and a sampling of the soil adjacent to those poles.  In a related cover letter, Dermody wrote:

> The results indicate that significantly elevated concentrations of penta were detected in the soil at both shallow and deep locations at two of the three poles.  . . .
>
> The penta concentrations at [these] Poles [ ] ranged in concentration from 29,900 micrograms per kilogram (mcg/kg) to 250,000 mcg/kg. These concentrations represent significant exceedances of the New York State Department of Environmental Conservation 6 NYCRR Part 375.6 Unrestricted Use Soil Cleanup Objective for penta of 800 mcg/kh.
>
> The use of penta was banned in 26 countries.  It was widely used in the United States until it was banned for public use by EPA in 1987.  Its use in the United States is now limited to wood preservation of utility poles and railroad ties.  The presence of penta on the poles and in the soil in the vicinity of the poles appears to represent a significant risk to human health and the environment.
>
> As stated previously, the EPA considers penta highly toxic and, therefore, its presence on utility poles presents an inhalation and ingestion risk.  Its presence in the soil presents a dermal contact, ingestion, and inhalation risk.  At the poles where penta is present, there is also a high potential for the penta to leach downward through the soil and contaminate the groundwater.

<u>See</u> Exhibit "C" to the Mar. 19, 2015 Affidavit of Judi Bosworth ("Bosworth Aff.").

Dermody also set forth a list of precautions that he recommends taking "to protect human health and the environment," which include:  installing fencing around the poles to prevent incidental contact by children, pets, and wildlife; installing placards to warn residents not to touch or otherwise make contact with the pole or the soil in its vicinity; notifying residents in the area of the potential hazard associated with the new poles; and instructing them to avoid the new poles to prevent inhaling or ingesting the chemical.

On April 24, 2014, Bosworth forwarded the Dermody Report to New York State Senator Jack Martins.  In a related cover letter, she expressed concern over the report's findings, including "possible contaminated groundwater resulting from penta and health threats related to the inhalation or ingestion of penta."  She requested that Senator Martins call upon the New York State Department of Environmental Conservation ("NYDEC") to investigate potential environmental and health issues arising from the use of utility poles treated with Penta or other similar chemicals.  As of the date of these cross-motions, the NYDEC had taken no action with respect to this issue.

On May 9, 2014, Bosworth's Chief of Staff, Cindy Cardinal, Esq., sent an e-mail to David M. Daly, the President and Chief Operating Officer of PSEG.  The e-mail stated, in relevant part, that the Town "believe[d] that people living near [the newly-installed utility] poles, and especially the parents of children who may encounter the poles as they walk on sidewalks, have the **right to know** that the

poles contain a highly toxic pesticide known to cause health problems and classified by the EPA as a Class 2B (probable) carcinogen" (emphasis in original).

Cardinal's e-mail attached a proposed warning sign that she, presumably on behalf of the Supervisor, suggested PSEG affix to its utility poles. The proposed sign prominently displayed the word "DANGER," and the phrase "Health Hazard – Do Not Touch!" In addition, the warning sign stated that the pole had been treated with Penta, a Group 2B probable carcinogen; that it is toxic to humans and animals through ingestion, inhalation and skin absorption; and advised that, in the event of accidental exposure, individuals should wash immediately with soap and water.

It is undisputed that, earlier on that same day, Doug Wood, the Executive Director of a civic association known as Grassroots Environmental Education, had provided to Cardinal the exact same language that was used in her e-mail to Daly, as well as the exact same proposed warning sign that she forwarded to him.

Approximately three days later, on May 12, 2014, PSEG informed the Town in writing that it did not wish to voluntarily post the proposed warning signs on its utility poles. However, in this regard, it is undisputed that the publicly-available website maintained by PSEG includes certain information about Penta, which is relevant to this discussion. In particular, the PSEG website features various articles and information about Penta-treated utility poles collected by Mike H. Freeman, a "Consulting Wood Scientist" in Memphis, Tennessee. Among the featured documents is one entitled "Penta Poles FAQ," on which the parties focus, and which poses the following question-and-answer:

> ***What should I do if I come into contact with a Penta treated wood pole?***
> Common sense care should be taken to limit prolonged skin contact with Penta treated poles or the soil at the base of the pole, just as care should be taken to limit exposure to other products containing pesticides like household garden and insect sprays. Avoid prolonged direct contact with Penta treated wood poles and wash hands or other exposed areas thoroughly.

See Mar. 18, 2015 Affidavit of Erin Reilley ("Reilley Aff.") (quoting Freeman, "Wood Utility Poles Treated with Pentacholorophenol Frequently Asked Questions," available at, wooddoc.org/utils/Penta/Penta_Poles_FAQ.pdf (last visited Jan. 22, 2016)).

On May 15, 2014, the Town issued a press release, stating that, despite the Supervisor's requests for PSEG to "alert the public" concerning the need to hand-wash after contact with Penta-treated poles, "so far PSEG-LI officials have not taken any steps to educate the public about the potential health risks associated with penta."

The parties stipulated that, on June 6, 2014, Thomas B. Johnson, Ph.D., a research scientist in the Bureau of Toxic Substance Assessment of the New York State Department of Health authored a letter to James Tomarken, MD, the Commissioner of the Suffolk County Department of Health Services. Initially, the Court notes that the admissibility of this document is questionable. Andrew McCabe, the individual whose affidavit provides the vehicle for its submission to the Court, does not establish that he has personal knowledge of the authenticity of the letter. Nor does he state any facts regarding the letter's origins. In any event,

without expressing an opinion at this time as to the ultimate admissibility of this document, the Court notes that it states the following:

> [P]eople would be unlikely to contact soil near the poles with sufficient duration and frequency to result in a significant risk for adverse health effects. To further evaluate exposure to this soil, we examined the potential for acute (short-term) health effects in a child who might sit at the base of a pole and eat some of the soil. Even at the highest pentachlorophenol soil concentration reported in the April 22, 2014 Dermody Consulting letter (250 milligrams per kilogram of soil), the exposures that might result from this kind of activity are well below exposure levels that might cause health effects.

> Regarding the health risks to people who might, for example, put their hands on the utility poles, there is ample scientific information to indicate that direct contact with pentachlorophenol can irritate the skin and eyes. Therefore, it is possible that people who have direct skin contact with a utility pole treated with pentachlorophenol-containing product could experience skin irritation. However, we would not expect frequent, routine or long duration skin contact with utility poles.

See Exhibit "C" to the Mar. 17, 2015 Affidavit of Andrew McCabe ("McCabe Aff.").

By letter to the Town dated June 10, 2014, PSEG reiterated that it would not post warning signs regarding Penta on its utility poles.

## D. The Relevant Legislative History

At a meeting of the Town Board held on June 24, 2014, the Supervisor stated that she intended to introduce local legislation, namely, Chapter 64A of the Town Code ("Chapter 64A"), which would require the removal of so-called "double poles" throughout the Town. Apparently, the term "double-poles" refers to the situation that occurs when new utility poles are installed, but the existing – and no longer functional – poles are not removed in a timely fashion. In some cases, these

existing poles are damaged from traffic accidents and weather, and the Town considers them to be "aesthetically unpleasant."

On July 3, 2014, the Town circulated a first draft of Chapter 64A, which provided that: whenever the Town authorized the installation of a new utility pole directly next to or in close proximity to an existing utility pole, the existing pole must be removed within 60 days.

On July 15, 2014, a public hearing was held. At this hearing, the Supervisor suggested adding a provision to the draft bill, which would also require "putting up notice" to "alert people to the penta in the poles, . . . to let people know that if they come in contact with the poles that they need to wash their hands."

On August 1, 2014, the Town circulated a revised version of Chapter 64A. Relevant here, the revised version included an express finding that "wood utility poles that are treated with pentachlorophenol constitute a potential danger to the public and that the public should be informed of such potential danger." To that end, the revised version of the bill provided:

> On any utility pole that has been treated with pentachlorophenol, the public utility shall post a sign on the utility pole, in a conspicuous location 5 feet from the base of the pole, that provides a warning that said pole contains pentachlorophenol. The sign shall contain the following warning: "NOTICE – THIS POLE CONTAINS PENTACHLOROPHENOL. AVOID PROLONGED DIRECT CONTACT WITH THIS POLE. WASH HANDS OR OTHER EXPOSED AREAS THOROUGHLY IF CONTACT IS MADE." The text of the warning shall be of a font size that is no less than 24 point. Failure to comply with the requirements of this section may result in penalties as provided for in § 64A-9 of this chapter.

Ans. Ex. "D" (emphasis in original); see Jnt. 56.1 Stmt. ¶ 34.

On August 12, 2014, a second public hearing was held, at which Supervisor Bosworth accepted written and oral comments on the draft bill from utility companies, including PSEG, as well as local civic associations and residents. In this regard, PSEG wrote a letter to the Supervisor opposing the enactment of Chapter 64A, as drafted. In particular, PSEG contended that, to the extent the revised version of Chapter 64A purports to require warning signs regarding Penta to be posted on utility poles, it violates PSEG's constitutional to equal protection under the Fourteenth Amendment because it "singles out utility poles treated with penta while completely ignoring utility poles treated with creosote or inorganic arsenic [other chemicals used for the same purpose]." Similarly, PSEG contended that the draft bill violated its First Amendment rights by forcing it to adopt a statement implying that Penta-treated utility poles are more hazardous than those treated with other chemical preservatives – a statement with which PSEG apparently disagrees.

At the August 12th hearing, Supervisor Bosworth acknowledged PSEG's arguments and noted that modifications intended to address its concerns were under consideration. In particular, the Supervisor stated that the Town would consider substituting the specific reference to penta with "pesticide or chemical or a more general term." A third public hearing to continue the discussion relating to the proposed warning signs was scheduled.

### E.    The Enactment of Chapter 64B

On August 29, 2014, while Chapter 64A was still undergoing revisions, the Town circulated a draft of a second proposed local law, known as Chapter 64B (previously defined as "Chapter 64B" or the "Ordinance").   Chapter 64B dealt solely with the issue of warning signs on utility poles, thereby leaving Chapter 64A to address its initial focus, namely, the removal of "double-poles."

Entitled "Utility Pole Hazardous Chemical Warning," Chapter 64B includes an explicit legislative finding that "wood utility poles that are treated with hazardous chemicals such as pentachlorophenol, creosote, inorganic arsenic, or other similar chemicals constitute a potential danger to the public and that the public should be informed of such potential danger."   Thus, in an express exercise of its "police power . . . for the preservation and protection of public health, safety, and general welfare," the Town Board proposed the following requirement for any utility poles installed after January 1, 2014:

> In a line of utility poles, the public utility shall post a sign on every fourth pole.  The sign shall be posted in a conspicuous location at least four feet and no more than five feet from the base of the pole.  The sign shall contain the following warning:   "NOTICE – THIS POLE CONTAINS A HAZARDOUS CHEMICAL.   AVOID PROLONGED DIRECT CONTACT WITH THIS POLE.  WASH HANDS OR OTHER EXPOSED AREAS THOROUGHLY IF CONTACT IS MADE."   The sign shall be oriented towards pedestrian traffic wherever possible.  The text of the sign shall be of a font size that is no less than 36 point.  The text of the sign shall be black on a white background.  Failure to comply with the requirements of this section may result in penalties as provided for in § 64B-4 of this chapter.

Compl. Ex. "1" (emphasis in original); see Jnt. 56.1 Stmt. ¶¶ 41, 45-48.

The Court notes that Chapter 64B defines the term "hazardous chemical" as "[a]ny chemical compound used as a wood preservative to treat wood utility poles to protect them from fungal decay and wood-destroying pests."

One week later, on September 5, 2014, PSEG wrote a second letter to the Supervisor, again opposing the enactment of Chapter 64B.  On September 8, 2014, a civic association known as the Treated Wood Council also wrote to the Board, urging it to reject Chapter 64B.  Nevertheless, at a public hearing held on September 9, 2014, the Town Board unanimously enacted Chapter 64B, as well as a modified version of Chapter 64A.

## F.    Additional Relevant Facts

### 1.    Facts Relating to Penta and CCA

John Samuelian, Ph.D., a Senior Managing Scientist at the national science and engineering consultancy Integral Consulting Inc., submitted an affidavit in support of the Plaintiffs' motion for summary judgment.  Samuelian, who has 28 years of experience in environmental consulting, environmental and analytical chemistry, and undertaking human and ecological risk assessments, offered his opinion as to the reasonableness of the Town's determination that chemical preservatives applied to utility poles constitute a danger to the public.

Initially, Samuelian opined that the Town did not perform an adequate assessment of the risk posed by the Penta-treated utility poles.  In this regard, he outlined various evaluative methods that the United States Environmental Protection Agency ("EPA") has espoused for determining the toxic risk presented by

exposure to certain chemicals. He opined that, not only did the Town fail to employ these methods, but it reached a conclusion regarding the toxic risk of Penta and CCA that is contrary to the EPA's own findings.

In particular, Samuelian noted that, in 2008, the EPA conducted its own evaluation of Penta and CCA. First, with respect to residential exposure to Penta, the EPA concluded, in part, that "assuming all pentachlorophenol exposure results from pentachlorophenol treated poles . . . the total risks result in no unreasonable adverse effects from the currently registered wood preservative use." See Mar. 18, 2015 Affidavit of John Samuelian, Ph.D. ("Samuelian Aff.") ¶ 16 (quoting "EPA Reregistration Eligibility Decision for Pentachlorophenol," at 21). The EPA made similar findings with respect to residential exposure to CCA. See id. ¶ 17.

In sum, Samuelian opined that "there is no reason to believe that the exposure potential to utility poles by Town residents or visitors would vary from that assessed by [the] EPA" and "[c]onsequently, given the low exposure potential for contact to the utility poles it is unlikely that any Town residents or visitors would be at a significant risk for this exposure pathway." Id. ¶ 18.

Although the Town does not offer opinion evidence to materially dispute Samuelian's findings – and does not dispute the EPA's risk assessments of Penta and CCA – it relies on certain information promulgated by the National Pesticide Information Center ("NPIC"). According to publicly available sources, the NPIC provides objective, science-based information about pesticides and pesticide-related topics to enable people to make informed decisions about pesticides and their use.

See "About NPIC," National Pesticide Information Center, available at, npic.orst.edu/about.html (last visited Jan. 27, 2016); see also Reilley Aff., Ex. "A" (relevant excerpts of NPIC website).

Relevant here, the NPIC identifies Penta as "a restricted use pesticide" which is "used industrially as a wood preservative for utility poles, railroad ties, and wharf pilings." Further, the substance "was widely used as a wood preservative until 1987 when its use was restricted to certified applicators." It further states that currently, Penta is "considered a probable human carcinogen and exposure to high levels can also have other health risks."

Moreover, according to the NPIC, "[c]hromated copper arsenate (CCA) wood preservatives contain chromium, copper and arsenic" and are "no longer used in most residential settings." Further, "[t]he chemicals in CCA-treated wood have been shown to leach into the surrounding environment and can transfer to the skin when people touch the wood." Although "CCA residues on the skin typically result in minimal exposure," "children's hand-to-mouth activity can lead to ingestion of the chemicals" and "[l]ong-term exposure to arsenic can increase the risk of cancer over a lifetime."

The Court notes that there is evidence in the record to demonstrate the prevalent use of Penta- and CCA-treated utility poles throughout the United States. In particular, Demetrios Thanasoulis, the Manager of Distribution Materials and Standards Engineering at Long Island Electric Utility Servco LLC, a subsidiary of PSEG, also submitted an affidavit in support of the Plaintiffs' motion for summary

judgment. Citing the EPA's 2008 Reregistration Eligibility Decision for Pentachlorophenol, Thanasoulis noted that approximately 60 million chemically-treated wooden utility poles were in service across the United States at that time. See Mar. 17, 2015 Affidavit of Demetrios Thanasoulis ("Thanasoulis Aff.") ¶ 8.

According to Thanasoulis, the use of wooden poles is standard in the utility industry for several reasons, including: (i) they are safer for utility workers to climb than concrete or steel alternatives; (ii) they present less of a risk of electrocution than metal alternatives; (iii) they are relatively lightweight, making them easier to transport; and (iv) they cause less damage to automobiles upon collision. See id. ¶ 12. However, in order to extend their useful lives, these wooden poles require chemical treatment – usually with Penta or CCA – to protect them from fungal decay and wood destroying insects and microorganisms. See id. ¶ 10.

Relevant here, Thanasoulis stated that, in addition to the 23 utility poles at issue in this case, PSEG also owns more than 25,000 chemically-treated utility poles throughout the Town. See id. ¶ 23. In this regard, he stated that the cost to the Plaintiffs of complying with Chapter 64B, namely, purchasing and installing the required signs on any utility poles that will need to be replaced in the future, will be great and, ultimately, passed on to the Plaintiffs' ratepayers. See id. ¶¶ 23-24.

The Court notes that none of the parties has identified any other state or local law that imposes a similar requirement on utilities as that required by Chapter 64B.

### 2. Other Structures Containing Chemically-Treated Wood in the Town

In support of their motion for summary judgment, the Plaintiffs also submitted an affidavit from Peter W. Zimmerman, a principal consultant at Integral Consulting Inc., the same science and engineering consultancy that employs Dr. Samuelian.

In his affidavit, Zimmerman states that, on February 4, 2015, he performed a reconnaissance of wood infrastructure located in public and publicly-accessible areas of the Town for the purpose of identifying wooden structures, other than utility poles, and assessing whether they were likely treated with preservative chemicals. See Mar. 18, 2015 Affidavit of Peter W. Zimmerman ("Zimmerman Aff.") ¶ 8. This site reconnaissance involved a visual survey of various locations within the town, which are outlined in the affidavit, and which led Zimmerman to conclude that, similar to the utility poles in question, they were "treated with chemical compounds used as wood preservatives to treat wood to protect the infrastructure from fungal decay and wood-destroying pests." Id. ¶¶ 15-16.

Zimmerman also evaluated the likelihood of human contact with these wooden structures. In this regard he noted "multiple potential points for human contact associated with recreational use, including but not limited to: (1) dock walkways comprising wood flooring, guard rails, and hand rails; (2) pilings lining the dock walkways immediately adjacent to walkways; (3) tennis courts with wood lining surrounding the bottom edge of the courts, and (4) the underside of some park benches." Id. ¶ 17.

In sum, Zimmerman concluded that:

> [T]here is a high potential for contact with the treated wood surfaces of these structures by multiple categories of potential human receptors [and] the type and duration of such contact would last for more extended periods of time than incidental contact with a utility pole, which would not be typically contacted during recreational activity. Further, if a utility pole was contacted, it would likely be for very limited duration compared to the other recreational uses described above.

Id. ¶ 18.

The Court notes that the Town does not dispute Zimmerman's findings in this regard and concedes that it owns and operates several public parks, which include wooden structures, such as docks, fencing, moorings to secure boats, and pilings to support the docks, which are treated with one or more chemical preservatives to protect the structures against fungal decay and wood-destroying pests. The parties agree that some of these structures contain CCA.

In his affidavit, Dr. Samuelian noted that he was familiar with the reconnaissance performed by his colleague, Zimmerman, and agreed that the areas of wooden infrastructure identified by Zimmerman "have a far greater potential for dermal contact or hand-to-mouth transfer by Town residents or visitors given their intended recreational uses . . . compared to utility poles, where comparable recreational activities would not normally occur." Samuelian Aff. ¶ 20.

It is undisputed that no provision of the Town Code, including Chapter 64B, requires warning signs to be posted on any wooden structures built on or adjacent to Town waterways, even if they are treated with chemical compounds used as wood preservatives. See Jnt. 56.1 Stmt. ¶ 59. Rather, the scope of the restriction is

limited to the Plaintiffs' utility poles. In this regard, the Court also notes that, notwithstanding Chapter 64B, Chapter 70-197 of the Town Code, entitled "Sign Prohibitions," provides that "[n]o sign shall be attached to any tree, fence or utility pole."

## G. This Action

As noted above, the Town signed Chapter 64B into law on September 5, 2014. By its language, the Ordinance became effective on March 1, 2015.

On January 15, 2015, the Plaintiffs commenced this action, seeking to enjoin the enforcement of Chapter 64B on the following grounds: (1) the Ordinance violates the Plaintiffs' right to be free from compelled speech under the First Amendment and Article 1 of the New York Constitution; (2) the Ordinance violates the equal protection clause of the Fourteenth Amendment insofar as it compels speech by utility companies, including the Plaintiffs, but not by others who own and operate similar wooden structures; (3) the Ordinance is impermissibly vague and overbroad and therefore violates basic principles of due process; and (4) the Ordinance is preempted by Article 33 of the New York Environmental Conservation Law ("ECL"), which grants to NYDEC exclusive jurisdiction to legislate matters pertaining to the distribution, sale, use and transportation of pesticides. The Plaintiffs also asserted a claim based on breach of contract, alleging that the added regulatory burden created by the Ordinance will interfere with various franchise agreements between the Plaintiffs and their consumers. However, the Court notes

that the complaint does not allege monetary damages arising from the breach of contract other than attorneys' fees and costs of the action.

The Town agreed to stay enforcement of Chapter 64B pending resolution of this lawsuit. On March 20, 2015, both parties moved for summary judgment.

On October 13, 2015, the Court granted a joint request to temporarily hold the cross-motions in abeyance while the parties engaged in settlement discussions. The stay expired on January 19, 2016, with no settlement having been reached.

## II. Discussion

## A. The Applicable Legal Standard

Under Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The Court 'must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party.'" Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc., 150 F.3d 132, 137 (2d Cir. 1998) (quoting Garza v. Marine Transp. Lines, Inc., 861 F.2d 23, 26 (2d Cir. 1998)).

"'[A]t the summary judgment stage the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 173-74 (2d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

**B.     As to Whether Chapter 64B Violates the Plaintiffs' First Amendment Rights**

The central question in the parties' cross-motions is whether the Ordinance unconstitutionally compels the Plaintiffs to engage in speech with which they allegedly disagree and which, if given the choice, they would choose not to make. The Court will first outline the relevant legal authorities and then proceed to consider the merits of the parties' respective positions.

**1.     The Governing Principles of Constitutional Law**

The Court's inquiry begins with the basic proposition that "the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." Wooley v. Maynard, 430 U.S. 705, 714, 97 S. Ct. 1428, 51 L. Ed. 2d 752 (1977). Indeed, "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.'" Id. (quoting W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 637, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943)); see Turner Broad. Sys. v. FCC, 512 U.S. 622, 641, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994) ("At the heart of the First Amendment lies the principle that each person should decide for him or herself the ideas and beliefs deserving of expression, consideration, and adherence").

Thus, well-settled Supreme Court precedents dictate the application of strict scrutiny to state or local statutes that require individuals to carry a particular government-sponsored message:

Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right. . . . Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. See Simon & Schuster, 502 U.S. __; id., at __ (KENNEDY, J., concurring in judgment); Perry Education Assn. v. Perry Local Educators' Assn., 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983). Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny. See Riley v. National Federation for Blind of N.C., Inc., 487 U.S. at 798; West Virginia Bd. of Ed. v. Barnette, supra.

Turner Broad. Sys., 512 U.S. at 641-42.

However, as the Court in Turner Broadcasting suggested, although well-entrenched in First Amendment jurisprudence, this basic principle is subject to "narrow and well-understood exceptions," id., one of which, namely, the "commercial speech doctrine," is asserted by the Town in this case.

The Supreme Court has long recognized that so-called commercial speech is entitled to less First Amendment protection than noncommercial speech. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 64-65, 103 S. Ct. 2875, 77 L. Ed. 2d 469 (1983) (citing Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York, 447 U.S. 557, 562-63, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980); Virginia Pharmacy Board v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771-72 n.24, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976)). Thus, where this doctrine applies, government attempts to regulate commercial speech will be subject to either intermediate scrutiny or rational basis review, both of which are less exacting than the strict scrutiny typically applied in the First Amendment context.

In this case, the parties disagree on two preliminary issues, namely: (i) whether the warning signs mandated by Chapter 64B constitute commercial speech; and (ii) whether, for purposes of this action, the Ordinance should be subject to strict scrutiny or some other, less exacting standard of review.  Before reaching the merits of the cross-motions, the Court will consider these preliminary questions in greater detail.

### 2.    Whether Chapter 64B Regulates Commercial Speech

"Because the degree of protection afforded by the First Amendment depends on whether the activity sought to be regulated constitutes commercial or noncommercial speech, [the Court] must first determine the proper classification of the [expression] at issue here."  <u>Bolger</u>, 463 U.S. at 65.  However, a precise definition of "commercial speech" has eluded courts tasked with applying the doctrine.  <u>See, e.g.</u>, <u>Zauderer v. Office of Disciplinary Counsel of Supreme Court</u>, 471 U.S. 626, 637, 105 S. Ct. 2265, 85 L. Ed. 2d 652 (1985) (noting that "the precise bounds of th[is] category of expression" are, indeed, "subject to doubt"); <u>Bad Frog Brewery v. New York State Liquor Auth.</u>, 134 F.3d 87, 94 (2d Cir 1998) ("The parties' differing views as to the degree of First Amendment protection . . . stem from doctrinal uncertainties left in the wake of Supreme Court decisions from which the modern commercial speech doctrine has evolved").

Further, the facts of this case are not easily compared with those of other cases that have considered this question.  In this regard, despite extensive and thorough legal briefing, the parties do not identify any case to have previously

considered the constitutionality of a state or local law that requires private corporations to post warning signs of the type contemplated by Chapter 64B. Nor has the Court's independent research revealed any.

Nevertheless, in formulating its opinion, the Court is not without guidance from the body of interpretive caselaw that has developed on this issue. For example, in <u>Bolger</u>, <u>supra</u>, the Supreme Court noted that the "the core notion of commercial speech" is that it "does 'no more than propose a commercial transaction.' " 463 U.S. at 66 (quoting <u>Virginia Pharmacy Board</u>, 425 U.S. at 762). This view of commercial speech has persisted, and in the more recent case of <u>New York Restaurant Association v. New York City Board of Health</u>, 556 F.3d 114 (2d Cir. 2009), the Second Circuit upheld a New York City regulation compelling chain restaurants to disclose the calorie content of their food products, reasoning that: "As commercial speech is speech that proposes a commercial transaction, and [the New York City regulation] requires disclosure of calorie information in connection with a proposed commercial transaction – the sale of a restaurant meal, the form of speech affected by [the regulation] is clearly commercial speech." <u>Id.</u> at 131; <u>accord Conn. Bar Ass'n v. United States</u>, 620 F.3d 81, 94 (2d Cir. 2010) (finding that a mandatory disclosure by debt relief agencies of the services they provide to debtors, the fee the debtors pay for those services, and the terms of payment constituted a "proposal of a commercial transaction," and therefore, a regulation of commercial speech (internal brackets omitted)); <u>Bad Frog Brewery</u>, 134 F.3d at 96-97 (finding

that a trade name featured on a beer bottle label sufficiently proposed a commercial transaction to qualify as commercial speech).

"[T]he Supreme Court has also identified commercial speech as 'expression related solely to the economic interests of the speaker and its audience.'" <u>Conn. Bar Ass'n</u>, 620 F.3d at 94 (quoting <u>Central Hudson Gas & Electric</u>, 447 U.S. at 561). Thus, in <u>National Electric Manufacturers Association v. Sorrell</u>, 272 F.3d 104 (2d Cir. 2001), the Second Circuit upheld a Vermont statute requiring manufacturers of mercury-containing products to place labels on their packaging to inform consumers that the products should be recycled or disposed of as hazardous waste. In so holding, the court noted that the law was intended "to better inform consumers about the products they purchase" and was "inextricably intertwined with the goal of increasing consumer awareness of the presence of mercury in a variety of products"; that the law was aimed at "encouraging [ ] changes in consumer behavior"; and that "the right of a commercial speaker not to divulge accurate information regarding his services is not [ ] a fundamental right." <u>Id.</u> at 115-16.

In this regard, <u>Safelite Group v. Jepsen</u>, 764 F.3d 258, 264 (2d Cir. 2014), is also instructive. In that case, the Second Circuit struck down a Connecticut statute that prohibited insurance companies and claims administrators from referring insureds to affiliated glass companies for repairs, unless they also gave the name of a competing glass company in the area. Focusing on the economic interests of those involved, namely, the market participants and consumers, the court noted that Safelite's commercial competitors had pushed for the challenged legislation because

they deemed Safelite to have a competitive advantage in contacting potential customers. See id. The court opined that "[p]rohibiting a business from promoting its own product on the condition that it also promote the product of a competitor is a very serious deterrent to commercial speech," partly because it is unlikely to further "consumer information[ ] goals." Id.

Relevant here, the Second Circuit drew an insightful distinction between the Connecticut statute at issue and more traditional kinds of commercial speech:

> The law does not mandate disclosure of any information about products or services of affiliated glass companies or of the competitor's products or services. Instead, it requires that insurance companies or claims administrators choose between silence about the products and services of their affiliates or give a (random) free advertisement for a competitor. This is a regulation of content going beyond disclosure about the product or services offered by the would-be speaker.

Id.

Thus, emphasizing the economic interests of the speaker and its audience, the court in Safelite indicated that commercial speech ordinarily relates to the promotion of, or disclosure of information about, the speaker's products or services.

Based on these authorities, it seems clear that, in order to qualify as commercial speech, the message sought to be regulated must necessarily bear some discernible connection to the commercial interests of the speaker. See id. at 263-64 (citing Sorrell in observing that "all of our case law applying Zauderer [rational basis review] to factual, commercial disclosure . . . has dealt with disclosure requirements about a company's own products or services"); see also Central Hudson Gas & Electric, 447 U.S. at 564 n.6 (noting that a "feature[ ] of commercial

speech [which] permit[s] regulation of its content" is that "commercial speakers have extensive knowledge of both the market and their products," and are therefore "well situated to evaluate the accuracy of their messages and the lawfulness of the underlying activity").

Applying these standards, the Court finds that the warning signs required by Chapter 64B constitute a form of expression that cannot be considered commercial speech. Simply stated, the warning signs bear no discernible relationship to the Plaintiffs' products, services, or other commercial interests, and are therefore outside the purview of the commercial speech doctrine.

In this regard, it is clear that the warning signs do not propose a commercial transaction of any kind. The record demonstrates that the Plaintiffs are the sole providers of electricity within the Town and have no direct market competitors. For this reason, the parties agree that the Plaintiffs do not engage in formal advertising or marketing, and do not promote the sale or transmission of energy to their ratepayers. However, even if this were not the case, the warning signs would serve no commercial purpose in an open market for electricity because they relate solely to the chemical treatment of the utility poles, which the Plaintiffs neither make nor sell.

Thus, despite the Town's contentions, this case is not similar to New York Restaurant Association v. New York City Board of Health. There, the mandatory disclosure of factual information, namely, calorie content in restaurant food, was commercial speech because it was being made "*in connection with*" a commercial

transaction, namely, the sale of a meal.  This case involves no relevant analogue.

Even assuming the accuracy of the information sought to be disclosed – namely, the

potential health hazards associated with chemical wood preservatives – the

Ordinance does not require the message to be delivered "*in connection with*" the

purchase or sale of electricity; utility poles; or chemical preservatives.  In fact, it

appears to be wholly immaterial to Chapter 64B's objective that the wooden poles

happen to carry electric transmission wires, or any commodity for that matter.  As

written, the Ordinance would succeed in fulfilling its legislative purpose if any

product, or no product at all, were channeled via the same passive wooden

infrastructure.  Therefore, in the Court's view, the warning signs are unrelated to

any commercial transaction and do not constitute commercial speech.

For these reasons, it is also clear that Chapter 64B does not regulate

"expression related solely to the economic interests of the speaker and its audience."

Again, even if the Court assumes the accuracy of the message – namely, that the

appropriate action for someone who has contacted a Penta-treated utility pole is to

wash his or her hands – there is nothing connecting this information to the

economic interests of the Plaintiffs or the people reading the signs.  In this regard,

the controlling authorities, outlined above, are clear:  to justify application of the

commercial speech doctrine, a mandatory disclosure must consist of more than

simply factual information; the information must also be *commercial* in nature –

that is, bearing in some discernible way upon the goods or services that the

Plaintiffs supply.  Nothing in the present record suggests that the Chapter 64B warning signs comport with this rule.

Thus, the facts of this case are also unlike <u>Sorrell</u>, where the Vermont mercury-labeling statute was intended "to better inform consumers about the products they purchase" and was aimed at "encouraging [ ] changes in consumer behavior."  On the contrary, the expressions at issue in this case provide no information to consumers about the products they purchase or the products the Plaintiffs supply.  Nor will the expressions operate to bring about changes in consumer behavior.  Although, arguably, the messages may succeed in stimulating a change in certain residents' behavior – for example, prompting pedestrians to avoid the poles and inspiring parents to keep their children away – this is not "consumer behavior" as that phrase was used in <u>Sorrell</u>.  As discussed above, the warning signs will have no relevant effect on consumer behavior because Town residents are not consumers of electricity in the ordinary sense – that is, by virtue of the Plaintiffs' statutory monopoly, residents have no meaningful choice when it comes to purchasing electricity elsewhere.  The same is true of the utility poles themselves, which are neither sold to nor used by the public.  Thus, in the Court's view, the warning signs are wholly unrelated to the economic or commercial interests of the Plaintiffs or their audience, and do not constitute commercial speech.

Accordingly, the Court finds that Chapter 64B does not regulate commercial speech, and therefore, is not entitled to a relaxed standard of constitutional review. Under these circumstances, strict scrutiny is the appropriate standard.

In reaching this conclusion, the Court addresses an ancillary argument raised by the Town in opposition to the Plaintiffs' motion for summary judgment, namely, that if the speech compelled by Chapter 64B is not determined to be "commercial speech," it should nevertheless be deemed "government speech," which would pose no First Amendment problem. The Court disagrees.

The so-called "government speech doctrine" operates from the basic premise that "the Government's own speech . . . is exempt from First Amendment scrutiny." Johann v. Livestock Mktg. Ass'n, 544 U.S. 550, 553 125 S. Ct. 2055, 161 L. Ed. 2d 896 (2005). In this regard, a government entity, such as the Town, "is entitled to say what it wishes, Rosenburger v. Rector and Visitors Univ. of Va., 515 U.S. 819, 833, 115 S. Ct. 2510, 132 L. Ed. 2d 233 (1991), and to select the views that it wants to express, see Rust v. Sullivan, 500 U.S. 173, 194, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991)." Pleasant Grove City v. Summum, 555 U.S. 460, 467-68, 129 S. Ct. 1125, 172 L. Ed. 2d 853 (2009).

However, in the Court's view, this doctrine has no applicability here, and the Town concedes that there is no precedent for extending the doctrine to the facts of this case. In this regard, speech is only exempt from First Amendment scrutiny when: (i) the government itself is the speaker; or (ii) the government appropriates public funds to transmit its message through private speakers. See Alliance for

Open Soc'y Int'l, Inc. v. United States Agency for Int'l Dev., 651 F.3d 218, 236-37 (2d Cir. 2011), aff'd, __ U.S. __, 133 S. Ct. 2321, 186 L. Ed. 2d 398 (2013); see also Legal Servs. Corp. v. Valezquez, 531 U.S. 533, 541, 121 S. Ct. 1043, 149 L. Ed. 2d 63 (2001). Neither of those circumstances is present in this case.

Chapter 64B does not require the Town to speak. Nor does it contemplate that the required speech will occur on public property. Nor does it attach public funds in any way to private speakers' transmission of the Town's message. Thus, it is unlike the legislation addressed in other cases that have considered the government speech doctrine. See, e.g., Summum, 555 U.S. 460 (involving permanent monuments displayed on public property); Johann, 544 U.S. 550 (involving government fundraising for advertising beef products); Alliance for Open Soc'y, 651 F.3d 218 (involving a regulatory scheme which attached federal funds to the adoption of an anti-prostitution policy).

Instead, the Ordinance in this case "compels Plaintiffs to voice the government's viewpoint and to do so as if it were their own. . . . Plaintiffs do not have the option to remain silent or neutral. Instead, they must represent as their own an opinion . . . that they might not [and, apparently, do not] categorically hold." Alliance for Open Soc'y, 651 F.3d at 237; see Walker v. Tex. Div., Sons of Confederate Veterans, Inc., __ U.S. __, 135 S. Ct. 2239, 2246, 192 L. Ed. 2d 274 (2015) (noting that "the Free Speech Clause itself may constrain the government's speech if, for example, the government seeks to compel private persons to convey the government's speech"); cf. Summum, 555 U.S. at 471 (in a case involving the

erection of monuments on public land, the Supreme Court noted that "[i]t certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated. And because property owners typically do not permit the construction of such monuments on their land, persons who observe donated monuments routinely – and reasonably – interpret them as conveying some message on the property owner's behalf").

Further, the Town does not offer any convincing reason to attribute the speech contained in the Chapter 64B warning signs to itself, rather than the utility companies whose privately-owned property must exhibit them. In this regard, the Court's reasoning is not altered by the Town's suggestion that, because public utilities are engaged in a "highly regulated" activity, their property is, essentially, quasi-governmental, so that the Town may lawfully speak on or through it. To accept that premise would allow the Town to circumvent the First Amendment rights of non-government speakers simply by regulating their business activities. The Town points to no relevant authority to support that proposition.

For these reasons, existing government speech doctrine cases provide no basis for sparing Chapter 64B from the appropriate First Amendment scrutiny, and the Court can discern no facts in the record to warrant an extension of existing doctrine to the facts and circumstances of this case. Therefore, as stated above, the Court finds that strict scrutiny is the appropriate standard of review.

### 3.     Does Chapter 64B Survive Strict Scrutiny?

In order to pass First Amendment muster, Chapter 64B must be justified by a compelling government interest and must be narrowly drawn to serve that interest. See Brown v. Entm't Merchs. Ass'n, __ U.S. __, 131 S. Ct. 2729, 2739, 180 L. Ed. 2d 708 (2011) (citing R.A.V. v. St. Paul, 505 U.S. 377, 395, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992)).   In this regard, the Town "must specifically identify an 'actual problem' in need of solving, and the evidence must establish that "curtailment of free speech [namely, in the form of a compelled noncommercial message] [was] actually necessary to the solution."   Brown, 131 S. Ct. at 2739 (internal citations omitted).   In the Court's view, it is clear that Chapter 64B does not survive this test.

Even if the Court were to assume that the risk to Town residents of exposure to chemically-treated wood utility poles constitutes a "compelling government interest" – a proposition that is vigorously disputed by the Plaintiffs and questionable on the current record – there is little doubt that less restrictive means of addressing that concern are available, which do not implicate the First Amendment rights of the utility companies.   In fact, the Town concedes this point.

In this regard, the Plaintiffs contend that "the Town is free . . . to press its message through signage placed on public property (including at public schools, on government buildings, *etc.*) or through other channels of communication (internet, radio, local television, pamphleteering) that the Town chooses to purchase and/or publish to its residents."   Pl. Memo of Law in Support of Summ. J. at 14 (emphasis

in original).  In response, rather than argue that the Ordinance is, in fact, narrowly tailored to promote the purported governmental interest, the Town conceded that it "could have chosen other methods to educate the public about utility poles, as plaintiffs point out."  Def. Memo of Law in Opp. to Pl. Mot. for Summ. J. at 9.

In this regard, the Town stated that:

> Plaintiffs propose signs in the Town right[s] of way, educational materials, public service announcements or warnings on the Town website.  But the Town is not required to pick one of these alternatives that is less likely to reach the pedestrian who is about to lean on the pole or the parent walking a child to school along a route with poles.  It was rational for the Town Board to make the common sense judgment that a sign on a pole is most likely to reach the person who needs to be warned about contact with the pole.

Id.

In the Court's view, this argument is insufficient to prevail under strict scrutiny.  Initially, the record does not support the assertion that a warning sign on every fourth utility pole is the method "most likely" to effectively communicate the Town's message to residents.  The Town identifies no evidence to substantiate this important statement, and the Court is unwilling to adopt the Town Board's "common sense judgment" to uphold the statute against a constitutional challenge.

Further, other than stating that the Ordinance reflects a "rational" decision concerning the efficacy of the warning signs, the Town makes no effort to explain why any one of numerous less restrictive means of transmitting its public safety message was not selected.  In this regard, the parties apparently agree that the Town is free to create, distribute, and display at its own expense the exact same warning signs contemplated in Chapter 64B on any and all Town property – of

which there is far more than the 23 privately-owned utility poles at issue in this case.

The Town is also free to engage in myriad other messaging efforts, such as distributing informational materials to its residents through the mail, as the Supervisor did on two separate occasions when the public debate about the utility poles was first being had – first to open a dialogue about the appearance of the new 80-foot poles, and again to announce PSEG's refusal to voluntarily post the Town's proposed warning signs.

Such alternative methods of addressing the Penta issue would, on their face, have had no impact on the First Amendment rights of the Plaintiffs or anyone else. On the contrary, such alternatives would have drawn the Town into the ongoing public debate regarding the Penta-treated poles, thereby keeping with "the core First Amendment values of promoting efficient exchange of information [and] protecting individual liberty interests." Sorrell, 272 F.3d at 114.

However, for reasons that the Town has not sufficiently set forth, it chose to forego these alternatives in favor of a law that not only compels the Plaintiffs to carry the Town's specific message as if it were their own, but also to bear the associated costs of doing so. In the Court's view, the evidence is plainly insufficient to support the conclusion that such a law represents the least restrictive means of promoting the Town's concerns about Penta. See Evergreen Ass'n v. City of New York, 740 F.3d 233, 246 (2d Cir. 2014), cert. denied, __ U.S. __, 135 S. Ct. 435, 190

L. Ed. 2d 327 (2014) (noting that, in order to survive strict scrutiny, a challenged statute "must use the least restrictive means to achieve its ends").

Under these circumstances, the Court finds that Chapter 64B is not narrowly tailored to serve a compelling government interest, and therefore fails under the doctrine of strict scrutiny. Accordingly, for the reasons set forth above, the Ordinance violates the First Amendment rights of the Plaintiffs, as a matter of law.

Having so held, the Court need not reach the parties' remaining contentions at this time.

## III. Conclusion

Based on the foregoing, the Court concludes that Chapter 64B of the North Hempstead Town Code constitutes an impermissible regulation of noncommercial speech, which violates the First Amendment rights of the Plaintiffs, as a matter of law.

Accordingly, the Court grants the Plaintiffs' motion for summary judgment to the extent it seeks to permanently enjoin enforcement of the Ordinance, and denies the Town's cross-motion for summary judgment in its entirety.

The Clerk of the Court is directed to close this case.


**SO ORDERED**

Dated:      Central Islip, New York    _Arthur D. Spatt_____
            February  3, 2016          ARTHUR D. SPATT
                                       United States District Judge